THE CITY OF BAYONNE, APPLICANT, v. THE BOARD OF PUBLIC UTILITY COMMISSIONERS ET AL., RESPONDENTS.

Submitted October 1, 1940—Decided May 6, 1941.

Before Justices CASE, DONGES and HEHER.

For the applicant, *Maurice A. Cohen.*

For the respondent Board of Public Utility Commissioners, *John A. Bernhard.*

For sixty-seven other respondents, *John R. Kelly* and *Theodore C. Baer.*

The opinion of the court was delivered by

CASE, J.   The question is whether the Board of Public Utility Commissioners was right in deciding that it had no authority to direct 67 individual bus owners to unite in constructing and maintaining a bus shelter wherein patrons of the various buses may be housed while waiting for transportation.   The proposed site is along Hudson County Boulevard at the Bayonne-Jersey City boundary line, on lands of the Hudson County Park Commission.   Applicant represents that it has obtained permission from the Park Commission for such erection.   Although the owners of the buses have, for their own purposes, effected an organization known as the South Hudson Boulevard Bus Owners Association, nevertheless it is the individuals, either corporate or natural, who own and operate and it is against them that the order is sought.

If there is authority in the board it must be found in *R. S.* 48:2-23, which has both the form and the substance of section 17(b) of the original act concerning public utilities, chapter 195, *Pamph. L.* 1911, passed at a time which antedated the auto bus and when public utilities were defined (section 15) to include any "steam railroad, street railway, traction railway, canal, express, subway, pipe line, gas, electric light, heat, power, water, oil, sewer, telephone, telegraph system, plant or equipment for public use, under privileges granted or hereafter to be granted by the State of New Jersey or by any political subdivision thereof." *R. S.* 48:2-23 provides: "The board may, after hearing, upon notice, by order in writing, require any public utility to furnish safe, adequate and proper service and to maintain its property and equipment in such condition as to enable it to do so."

Applicant relies upon that statutory provision and upon the following decisions of either court or board: *In re Station at Passaic Park,* 40 *N. J. L. J.* 238; *Erie Railroad Co.* v. *Public Utility Commissioners,* 85 *N. J. L.* 420; *Delaware, Lackawanna and Western Railroad Co.* v. *Board of Public Utility Commissioners,* 83 *Id.* 212; *Erie Railroad Co.* v. *Board of Public Utility Commissioners,* 89 *Id.* 57 (at *p.* 78); *Township Committee, &c.,* v. *Central Railroad Co.,* 47 *N. J. L. J.* 169; *In re Public Service Co-ordinated Transport,* Volume XIV of the Reports of the Board of Public Utility Commissioners, page 34 (July 12th, 1928-April 8th, 1930).

*In re Station at Passaic Park, supra,* was a matter heard and decided by the commission and had to do with the rebuilding by the Erie Railroad Company of one of its existing railroad stations. The decision of the Supreme Court in *Erie Railroad Co.* v. *Public Utility Board, supra,* reported in 85 *N. J. L.,* concerned the furnishing of drinking water on railroad trains and reversed an order which had been made by the board and which required the company to provide a supply. The cited Delaware, Lackawanna and Western Railroad Company case affirmed a commission order which directed a railroad company, if it supplied drinking water, to do so with individual cups or a sanitary glass. The reference to page 78 of the Erie Railroad Company case reported

in 89 *N. J. L.* concerns a *dictum* to the effect that the Board of Public Utility Commissioners would have power, under section 17(b) of the statute, to order a relocation of a railroad station. *Township Committee* v. *Central Railroad, supra,* related to the extension of existing railroad stational facilities. The case printed at page 34 of Volume XIV of the Board's Reports was a dismissal of a complaint regarding the crowding of a sidewalk by prospective patrons of the cars of the Public Service Co-ordinated Transport and held that the question of relieving undue congestion was for the police. None of the cited decisions goes even remotely to the question of shelter or waiting rooms for buses, much less to the forcing of nearly seventy individual owners and operators into a compulsory co-operative building and maintenance project.

The auto bus first entered our statutory system by separate legislation, *e. g.,* chapter 136, *Pamph. L.* 1916, and later was included in the Utility Act, chapter 149, *Pamph. L.* 1921; and while it is now an integral part of the utility statute and is affected by all pertinent provisions thereof, nevertheless intelligent construction of that statute must have regard for the attributes of the bus system and the respects in which it differs from those other and older forms of passenger transportation for which the legislation was originally framed. Railroads operate upon private rights of way. They do not render a "pick-up" service. From their inception they have had fixed stopping points and have maintained station facilities at those points. They have the right of eminent domain and may, by the strong arm of the law, take lands that are necessary for their operation. Street railways operate by virtue of statutory authority, municipal franchise and consents of adjoining property owners; they have certain rights of construction and installation in the public highways; they, too, have the power to condemn; and the nature of their trackage and motive power tends to make them monopolistic. But the auto bus, moving with greater freedom, without physical restriction and under its own power, merely uses the public highways under municipal consents approved by the Board of Public Utility Commissioners. It has not the authority to construct in the highways and has not the power

of eminent domain. Its rights are more transient and personal.

Whether the Board of Public Utility Commissioners has no authority, under any circumstances, to direct a bus owner to erect a shelter need not be now decided. It has not, in our opinion, the authority to compel, as in this instance it is asked to do, a large number of owners and operators to engage in a mass enterprise to that end. The confusion incident to planning, construction and operation by the nearly seventy individual interests which would here be subject to the order indicates the impracticability of the scheme and the unlikelihood that the legislature meant to authorize such a proceeding.

The question presented is one of law. We find adversely thereon and see no reason for allowing a writ.

The application will be denied, without costs.